## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                                    **CASE NO. 6:15-bk-03448-KSJ**

**ORLANDO GATEWAY**                                       **CHAPTER 11**
**PARTNERS, LLC,**

                         **Debtor.**
_____/

**GOOD GATEWAY, LLC, a Florida**
**limited liability company, and**
**SEG GATEWAY, LLC, a Florida**
**limited liability company**
                                                          **Adv. Case No. 6:15-ap-**
           **Plaintiffs,**
**vs.**

**NILHAN FINANCIAL, LLC,**

           **Defendant.**
_____/


### COMPLAINT

Plaintiffs, **GOOD GATEWAY, LLC** ("Good Gateway") and **SEG GATEWAY, LLC**

("SEG"), as the largest secured judgment creditors of **ORLANDO GATEWAY PARTNERS, LLC**

("OGP" or the "Debtor"), by and through their undersigned attorneys, hereby sue **NILHAN**

**FINANCIAL, LLC** ("Nilhan Financial" or "Defendant"), pursuant to 11 U.S.C. §§ 105, 502, and

510, Rule 7001 of the Federal Rules of Bankruptcy Procedure, and object to proof of claim no. 10

filed by Nilhan Financial in the bankruptcy case of OGP, and, in support thereof, states as follows:

## NATURE OF ACTION

1.      This is an adversary proceeding to: (i) subordinate Nilhan Financial's secured claim (proof of claim number 10, the "Claim") that arises out of a note and mortgage originally made by Georgian Bank to the Debtor, pursuant to 11 U.S.C. §510(c) to the level of equity; (ii) recharacterize the Claim as capital contributions to OGP; and (iii) object to the Claim for the reasons noted herein.

## JURISDICTION, VENUE AND PARTIES

2.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. §§1334 and 157.

3.      Venue is proper in this district under 28 U.S.C. § 1409.

4.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B) and (O).

5.      On April 20, 2015 ("Petition Date"), OGP and Nilhan Hospitality, LLC ("Nilhan Hospitality"), an affiliated or related debtor and debtor-in-possession, filed their voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code.

6.      OGP is a Florida limited liability company with its principal place of business in Alpharetta, Georgia.  On or about August 16, 2007, OGP was formed for the purpose of acquiring and developing that certain real property generally located at the northwest corner of The Beachline Expressway (SR 528) and Semoran Boulevard (SR 436), Orlando, Florida (the "Original Property").

7.      OGP's development efforts for the Original Property involved a multi-phase, mixed use development featuring hotels, Class "A" office space, boutique retail, restaurants and luxury apartments, which is commonly referred to as the Orlando Gateway Project (the "Project").  That portion of the Original Property which is currently owned by OGP consists of four separate parcels,

one parcel (approximately 17 acres) which has been partially developed, with a portion of it leased to Sixt Rent-A-Car, LLC. The second parcel (approximately .14 acres) is rented to Clear Channel Worldwide and contains a billboard, and the remaining two parcels (approximately 10.75 and 20.10 acres respectively) are currently vacant (collectively, the "OGP Property").

8.      Nilhan Hospitality is purportedly a Florida limited liability company with its principal place of business in Sunny Isles Beach, Florida. Nilhan Hospitality was originally incorporated in Georgia. Nilhan Hospitality owns approximately 15.75 acres of commercial real estate located near the Orlando International Airport on the West side of South Semoran Boulevard and North of the State Road 528/The Beachline Expressway, which at one time was part of the Original Property. The portion of the Original Property which is owned by Nilhan Hospitality consists of two separate parcels, one parcel (approximately 7.27 acres) has been partially developed and has two buildings located at 5463 Gateway Village Circle and 5475 Gateway Village Circle, which are approximately 15,000 square feet in size. The buildings are used as retail space and are leased to tenants including Bonefish Grill, Carraba's Italian Grill, International House of Pancakes, Ari Hibachi and Sushi Japanese Restaurant and a nail and hair salon. The second parcel (approximately 8.47 acres) is vacant.

9.      Chittranjan K. Thakkar ("Thakkar") is the principal and/or representative of both the Debtors, and several non-debtor entities, including but not limited to: (i) Niloy & Rohan, LLC ("Niloy"), a Georgia limited liability company; (ii) Nilhan Financial; (iii) NCT Systems, Inc., a Florida corporation ("NCT"); and (iv) Niloy, Inc., a Georgia corporation doing business as DCT Systems, Inc. and/or "DCT" ("Niloy, Inc. " and/or "DCT") (collectively the "Thakkar Non-Debtor Entities").

10.    Nilhan Financial, a limited liability company which is managed by Thakkar, holds a mortgage on the OGP Property and a security interest in the rents collected from the tenants. Nilhan Financial is allegedly owed approximately $34,000,000.00.

## PROCEDURAL AND FACTUAL BACKGROUND

### OGP, THE REAL PROPERTY AND THAKKAR'S PRE-PETITION BREACHES OF DUTY

11.    As part of the formation of OGP, an operating agreement was prepared, approved and adopted by OGP and its members. OGP's operating documents were subsequently amended in November of 2007, including modification of the members and ownership interest.  In conjunction with same, SEG was formed and consisted of Good Gateway and Orlando Gateway, LLC ("OG") as members. As part of the formation of SEG, an operating agreement was prepared, approved and adopted on behalf of SEG by its members (the "SEG Operating Agreement").

12.    Pursuant to the SEG Operating Agreement, "Major Decisions" require the unanimous vote of the members--both Good Gateway and OG. In relevant part, the SEG Operating Agreement provides that "purchasing, selling or leasing the Property or any portion thereof or any other property to approving for Orlando Gateway Partners any 'Major Decision' constitutes a 'Major Decision' under the SEG Operating Agreement."

13.    OGP's amended operating documents from November of 2007 (the "OGP Operating Agreement") also address "Major Decisions."  Pursuant to the OGP Operating Agreement, "Major Decisions" require the unanimous vote of the members.  The OGP Operating Agreement also provides that "selling or leasing the Property or any portion thereof" constitutes a "Major Decision."

4

\

14.    In August of 2008, OGP's membership and ownership interest were modified with the inclusion of Niloy. Thus, OGP's members became SEG and Niloy. SEG continued to consist of two (2) members - Good Gateway and OG.

15.    On March 27, 2009, OGP transferred certain portions of the Original Property without Good Gateway's consent or approval. The portions of the Original Property involved in the March 2009 transfer (the legal description for "The Frontage Property" is attached hereto as **Exhibit A** and is incorporated herein by reference) encompassed the frontage along Semoran Boulevard, which was actively being marketed for restaurants and specialty retail by Good Capital Group, Inc. The Frontage Property was and remains one of the, if not the, most valuable portions of the Original Property. Furthermore, Nilhan Financial released its mortgage rights regarding the Frontage Property, but did not reduce the amount of the mortgage remaining on the rest of the Original Property. Good Gateway was not given an opportunity to exercise its rights under the operating documents regarding the "Major Decision" of transferring the Frontage Property.

16.    On or about March 27, 2009, OGP and Nilhan Hospitality executed a Blanket Transfer, Assignment and Bill of Sale for certain portions of the Original Property (the "Transfer and Sale Agreement"). That same day, OGP and Niloy also executed a Special Warranty Deed granting Nilhan Hospitality title to the portion of the Original Property subject to the Transfer and Sale Agreement (the "Deed"). OGP and Nilhan Hospitality also executed an Acquisition Closing Statement reflecting that Nilhan Hospitality paid $100.00 for the Original Property with the remaining $7,499,900.00 of the purchase price deferred (the "Closing Statement").

17.    Even though OGP did not have Good Gateway's required consent, OGP transferred the Frontage Property to Nilhan Hospitality, an entity that Thakkar is a principal of and seventy

5

\

percent (70%) owner of, but in which Good Gateway has no interest.  None of the persons or entities involved (OG, Niloy, Nilhan Financial, or Thakkar) had the right, authority or consent to transfer the Frontage Property and usurp Good Gateway's rights under the operating documents, or under Florida law.  Good Gateway never consented to or approved, expressly or impliedly, the transfer and sale of any portion of the Frontage Property to Nilhan Hospitality.

18.     After the transfer of the Frontage Property in March of 2009, Good Gateway continued to object and raise concerns over the circumstances surrounding the transfer. OG, Niloy, Nilhan Hospitality, Niloy, Inc., and Thakkar all continued to represent to Good Gateway their agreement that the improper transfer would be unwound and restructured, and Good Gateway's rights and interest in the Frontage Property would be restored or reinstated.  There were continuing discussions among the parties regarding how to do accomplish the unwinding of the transfer, or alternatively Niloy and Thakkar would purchase of SEG's membership interest in OGP.

19.     Niloy and Thakkar agreed to restore OGP's, SEG's, and Good Gateway's interest in the Frontage Property or to pay Good Gateway appropriate compensation for the transfer. However, on or about November 13, 2009 (the "November 13, 2009 Closing"), Steven C. Smith ("Smith"), purportedly on behalf of OG and SEG, and Thakkar, on behalf of Niloy, OGP, Nilhan Hospitality, Nilhan Financial, Niloy Inc., and NCT allegedly settled their unrelated dispute at a "Closing" and prepared a Closing Binder Index containing numerous assignment documents, releases, and transactions which purported to resolve the interests of, and disputes between, Thakkar, Smith, OGP, Nilhan Financial, Niloy, OG, Niloy Inc., NCT, and SEG.

20.     At the same time, Thakkar, on behalf of Niloy, without Good Gateway's knowledge or consent, subsequently assigned Good Gateway's interest in OGP to NCT in a document prepared

6

\

by, and executed for, the assignor (Niloy) and assignee (NCT) by Thakkar.  Thakkar, as 100%

owner of NCT and as Managing Member,  acted on behalf of Niloy, Inc. and NCT when he assigned

Good Gateway's interest in OGP to NCT on November 13, 2009.

21.    Neither SEG nor its member Good Gateway consented to or approved, expressly or

impliedly, the transfer of SEG's membership interest in OGP to Niloy and NCT, and SEG and Good

Gateway had previously put Niloy, Thakkar, and the Thakkar Non-Debtor Entities on notice that

Good Gateway's consent was required for any "Major Decision" and that neither SEG, OG, nor

Smith had the sole authority to assign such interest without satisfying the notice, meeting, and voting

provisions in the SEG and OGP Operating Agreements.

22.    On July 10, 2010, Good Gateway filed a complaint commencing the litigation styled

Good Gateway, LLC v. Orlando Gateway Partners, LLC, et al., Case No. 2010-CA-015312-O

(Division 43) (the "Florida State Court Litigation"), in the Circuit Court of the Ninth Judicial Circuit

in and for Orange County, Florida (the "Florida State Court").  Ultimately, after trial and in the fall

of 2014, the Florida State Court Litigation resulted in three judgments totaling in excess of $15

million (collectively, the "Florida Judgments") being entered against Thakkar personally, the

Debtors, Niloy and NCT.

23.    The jury in the Florida State Court Litigation found the following:  (i) Thakkar,

Nilhan Hospitality, NCT, OGP, and Niloy were jointly and severally liable to SEG for

$12,000,000.00 on the tort claims of:  (a) breach of fiduciary duty; (b) tortious interference; (c) civil

conspiracy; (d) conversion, and (e) constructive fraud; (ii) OGP and Niloy were also jointly and

severally liable to SEG for breach of contract, as such $3,376,435.58 in prejudgment interest was

attached to the $12,000,000.00 verdict; and (iii) Thakkar, the Debtors, Niloy and NCT were jointly

and severally liable to Good Gateway for $2,500,000.00 on the tort claims of: (a) breach of fiduciary duty; (b) tortious interference; (c) civil conspiracy; (d) conversion, and (e) constructive fraud.

24.     On October 3, 2014, Good Gateway and SEG filed certified copies of the Florida Judgments in the public records for Orange County, Florida. Copies of the Florida Judgments are attached hereto as **Exhibit B** and are incorporated herein by reference. Although the Florida Judgments were timely appealed, a stay of execution was not obtained, and a subsequent writ of execution was issued. The Orange County Sheriff levied on the real property owned by Nilhan Hospitality and OGP, and scheduled an execution sale of the real property for April 21, 2015.

25.     The instant bankruptcy petitions were filed on the eve of the Sheriff's sale of the Debtors' real property scheduled for April 21, 2015.

<u>OGP AND NILHAN FINANCIAL'S INTER-COMPANY RELATIONSHIP</u>

26.     On or about November 14, 2007, OGP executed and delivered to Georgian Bank, a Georgia banking corporation, the following documents: (i) a Promissory Note in the original principal amount of $24,262,052.00 (the "Note"). A copy of the Note is attached hereto as **Exhibit C** and is incorporated herein by reference; (ii) a Mortgage and Security Agreement, which was recorded on November 15, 2007 (the "Mortgage"). A copy of the Mortgage is attached hereto as **Exhibit D** and is incorporated herein by reference; and (iii) an Assignment of Leases and Rents which was recorded on November 15 (the "Assignment of Leases"). A copy of the Assignment of Leases is attached hereto as **Exhibit E** and is incorporated herein by reference. The maturity date for the Note and Mortgage was November 14, 2008.

8

\

27.     The Note is further secured by the following documents: (i) a Uniform Commercial Code ("UCC") Financing Statement recorded on November 15, 2007, in O.R. Book 9507, Page 4064 of the Public Records of Orange County, Florida (the "UCC Financing Statement").  A copy of the UCC Financing Statement is attached hereto as **Exhibit F** and is incorporated herein by reference; and (ii) the UCC Financing Statement filed with the Secretary of State, Tallahassee, Florida on November 20, 2007 under File No. 200707043059.  A copy of the UCC Financing Statement is attached hereto as **Exhibit G** and is incorporated herein by reference.

28.     On or about August 22, 2008 Georgian Bank executed and delivered to Nilhan Financial the following documents; (i) a Transfer and Assignment of Mortgage and Security Agreement (the "Assignment of Mortgage") wherein Georgian Bank assigned all of its rights, title and interest in and to the Mortgage to Nilhan Financial. A copy of the Mortgage is attached hereto as **Exhibit H** and is incorporated herein by reference; and (ii) an Assignment of the Note and loan documents securing the note (the "General Assignment") wherein Georgian Bank assigned all its right, title and interest in and to the Note, Mortgage, Assignment of Lease, UCC Financing Statement and all other documents executed in connection with the Note to Nilhan Financial. A copy of the General Assignment is attached hereto as **Exhibit I** and is incorporated herein by reference.

29.     On or about August 22, 2008, OGP and Nilhan Financial allegedly entered into that certain Notice of Future Advance and First Mortgage Modification Agreement (the "Mortgage Modification"). A copy of the Mortgage Modification is attached hereto as **Exhibit J** and is incorporated herein by reference.

30.     The Mortgage Modification does not alter the maturity date contained in the Note and Mortgage.  The Mortgage Modification does refer to an Amended and Restated Renewal Promissory

Note, dated August 22, 2008 (the "Amended Note").  A copy of the alleged Amended Note is attached hereto as **Exhibit K** and is incorporated herein by reference.  However, as set forth in the Mortgage Modification, the Amended Note merely represents an amendment, restatement and renewal of the Note.  There is no mention in paragraphs 1-10 of the Mortgage Modification of a new maturity date.  Although the Amended Note does reference a maturity date of July 15, 2011, that date could only be effective if new funds were in fact advanced to OGP, which Good Gateway and SEG do not believe occurred.

31.     As of August 22, 2008, Nilhan Financial became the owner and holder of the Note, Mortgage, Assignment of Leases, UCC Financing Statement, Assignment of Mortgage, General Assignment, Mortgage Modification, UCC Assignment, Replacement Note and Second UCC Financing Statement (collectively, the "Security Instruments").

32.     On or about September 4, 2008, Nilhan Financial filed that certain Assignment of UCC Financing Statement with the Secretary of State, Tallahassee, Florida under File No. 200809088914 (the "UCC Assignment").  A copy of the UCC Assignment is attached hereto as **Exhibit L** and is  incorporated herein by reference.

33.     By summer 2009, OGP still had never made one payment to Nilhan Financial under the Note.  Thakkar, who owned, managed, and controlled the Thakkar Non-Debtor Entities, OGP, and Nilhan Hospitality, promised Good Gateway and SEG that from August 22, 2008 through November 13, 2009 that Thakkar would restructure the Note and Mortgage as Thakkar's family's equity in OGP and that he would rescind the 2009 Nilhan Hospitality transfer to return ownership of the retail land to OGP.

\

34.     Good Gateway and SEG and Thakkar negotiated and Thakkar and Smith signed a Term Sheet on July 6, 2009 agreeing to restructure the Nilhan Hospitality GA transfer, to reduce the OGP debt on the Nilhan Financial Note by $5,400,000.00, and Thakkar once again promised that any Nilhan Financial loan would be treated as equity and get a preferred return (the "Term Sheet"). In the Term Sheet Thakkar used the initials "CKT" simultaneously and interchangeably for Nilhan Financial and the Thakkar Non-Debtor Entities, OGP, and Nilhan Hospitality.  A copy of the Term Sheet is attached hereto as **Exhibit M.**

35.     Thakkar never performed on any of the false promises in the Term Sheet even though he signed it, but instead continued to the next stages in his scheme to take over OGP, which resulted in default judgments and the foreclosure action that he promised never to file.

36.     In September 2009, although OGP was in default, the Thakkar Non-Debtor Entities agreed to provide additional funds to OGP and the Project in exchange for a preferred return.

37.     On May 15, 2012, during Thakkar's deposition in the Florida State Court Litigation, Thakkar produced from his own records the Third Amendment to the OGP Operating Agreement signed in October 2009.  The Third Amendment to the OGP Operating Agreement provided at paragraph 7 that if Thakkar failed to provide any guaranty requested by Nilhan Financial, Thakkar would be removed as a member.

38.     Thakkar took what he thought was his final step to gain 100% ownership and control of OGP in order to provide more assets for the Thakkar family, who along with Niloy Inc. and Nilhan Financial needed the OGP equity as collateral for Thakkar's and the Thakkar Non-Debtor Entities' debt to Wells Fargo and BB&T.

11

\

39.    Relying on Thakkar's false promises to restructure the Note and Mortgage and unwind the Nilhan Hospitality GA transfer, Good Gateway and SEG continued to perform as members of and brokers for OGP throughout 2009, and negotiated amendments to the operating agreements of OGP, SEG, Nilhan Hospitality, drafts of which were prepared by Thakkar's lawyers at Shutts & Bowen, LLP.

40.    Unbeknownst to Good Gateway and SEG, on or about the November 3, 2009 Closing, Thakkar and Smith signed yet another "work out" term sheet to totally oust Good Gateway and SEG with Thakkar signing for all the Thakkar Non-Debtor Entities, OGP, and Nilhan Hospitality.  Then on November 13, 2009, Nilhan Financial and the Thakkar Non-Debtor Entities induced Smith by releasing him of $44,825,000.00 in personal guarantees and debt on the following: (a) Nilhan Financial March 14, 2008 Note regarding Sugarloaf Centre ($14,000,000.00); (b) Nilhan Financial August 22, 2008 Note regarding OGP ($25,500,000.00); (c) Nilhan Financial September 10, 2008 Note regarding Sugarloaf Centre ($5,275,000.00); and Thakkar's personal loan to Smith on August 15, 2008 ($50,000.00 - the balance was $55,154.00).

41.    Smith, without authority, purportedly on behalf of OG and SEG, and Thakkar on behalf of the Thakkar Non-Debtor Entities, signed those documents at a "closing", and Thakkar and Nilhan Financial prepared a "Closing Binder Index, Resolution of Partnership Issues Steven C. Smith and Chittranjan K. Thakkar", containing the referenced assignment documents, releases, and transactions which purported to give Thakkar 100% ownership and control of OGP and the Project. The result was that Smith was released of all debt and liability (almost $45,000,000.00) to Nilhan Financial.

\

42.     One of the assignments included in the Closing Binder Index was the Assignment of Membership Interest (the "November 13, 2009 Assignment"), signed by Smith on behalf of SEG, and Thakkar on behalf of Niloy & Rohan, purporting to assign SEG's 45% membership interest in OGP to Niloy & Rohan.  The second recital in the November 13, 2009 Assignment references that Smith and OG purported to transfer all of SEG's membership interest in OGP to Niloy & Rohan, resulting in Niloy & Rohan's and Thakkar's one hundred percent (100%) ownership of OGP's membership interests.

43.     On the same day, November 13, 2009, Niloy & Rohan, with the participation of all the Thakkar Non-Debtor Entities, then assigned Good Gateway's and SEG's interests to NCT in the Fourth Amendment to the Operating Agreement prepared by, and executed for, the assignor (Niloy & Rohan) and assignee (NCT) by Thakkar and signed by Niloy Thakkar.

44.     Further, the OGP Operating Agreement provided Good Gateway and SEG with a "bullet buy-sell" provision, which entitled SEG to buy out Thakkar's and Niloy & Rohan's membership interest for $1.00.  Good Gateway and SEG were entitled to take over OGP and manage it instead of Thakkar and the Thakkar Non-Debtor Entities with their intentional defaults and breaches.

45.     On or about December 1, 2012, OGP and Nilhan Financial allegedly entered into a replacement promissory note in the original amount of $32,314,409.69 which replaced the Note (the "Replacement Note").  A copy of the Replacement Note is attached hereto as **Exhibit N** and is incorporated herein by reference.

46.     The Replacement Note is purportedly further secured by the following documents: (i) a Uniform Commercial Code Financing Statement recorded on November 25, 2014 , filed in the

public records of Orange County, Florida (the "Second UCC Financing Statement"). A copy of the Second UCC Financing Statement is attached hereto as **Exhibit O** and is incorporated herein by reference; and (ii) the Second UCC Financing Statement filed with the Secretary of State, Tallahassee, Florida on November 26, 2014 under File No. 20140264842X. A copy of the Second UCC Financing Statement is attached hereto as **Exhibit P** and is incorporated herein by reference.

47.     As set forth in the General Assignment, Nilhan Financial also acquired the Guaranty of Payment and Performance executed by Steven C. Smith dated November 14, 2007 (the "Smith Guaranty") and the Guaranty of Payment and Performance executed by J. Charles Hendon, Jr. Dated November 14, 2007 (the "Hendon Guaranty"). However, as part of the November 13, 2009 Closing, the Smith Guaranty and the Hendon Guaranty were released for little to no consideration.

48.     On June 5, 2013, OGP filed a bankruptcy petition in the U.S. Bankruptcy Court for the Middle District of Florida under Case No. 6:13-bk-07056 (KSJ). This constituted yet another default waived by Thakkar on the Note and Mortgage. Thakkar signed all the schedules and stated in the Schedule of Creditors, filed on July 2, 2013, that the debt to Nilhan Financial was $35,000,000.00 (with $22,000,000 secured) and, on August 8, 2013, $32,301,207.65 (with $22,000,000 secured) - a different amount than the Replacement Note of December 1, 2012.

49.     Thakkar continued to treat the Note as his equity in OGP. At the § 341 Meeting of Creditors hearings, Thakkar testified that all the Thakkar entities were treated as one (*e.g.*, when Thakkar was asked "where does the debtor [OGP] receive rent?" Thakkar responded that "It is assigned over to the - to Nilhan Financial" and that essentially none of the rent that the tenants pay goes to OGP) A copy of the July 8, 2013 transcript is attached hereto as **Exhibit Q** and is incorporated herein by referenced. (See 7/8/13 Hrg. Tr. at 26:20-25 and 8/5/13 at 75:1-2 "And all

14

of the assets that are listed on the [OGP bankruptcy] schedule are held in trust…").  Additionally,

at the hearing of May 22, 2014, Thakkar testified that all of the Thakkar entities were the same (see

5/22/14 Hrg. Tr. as follows) (A copy of the May 22, 2014 hearing trranscript is attached hereto as

**Exhibit R** and is incorporated herein by reference.):

> I can tell the Court this is family owned … when I look at my son and my wife, the changes between the two entities happens all the time in terms of ownership.  All of our entities are the Thakkar's family.  We don't differentiate … So if there's a transfer in my name or their name, my mind, it is in the Thakkar family, so I have never differentiated.  So for me when somebody asks me who owns it, even today, I would not be able to accurately answer my 50 entities in which we are hundred-percent owner, whether it's 10 percent maybe or 50 percent maybe.
>
> <u>Id. at 39:6-10, 17-23.</u>

> So, yes, it is not dealt with on a financial basis, because we consider our family asset, our family asset.  That's the simple explanation.
>
> <u>Id. at 41:6-8.</u>

> 50.     Thakkar and Nilhan Financial prepared their own legal documents.

> … as I indicated earlier in the Thakkar family, all the changes that are made are made in an informal fashion. You can see by the print, it has not gone through legal counsel. It may have been effective dated, but it may have been a week or two later.
>
> <u>Id. at 61:4-9.</u>

> Q:      What happened to the loan, that Georgian Bank loan, in August of 2008?
> A:      At that stage, Nilhan Financial went to Wells Fargo, borrowed the money from them through a joint borrowing agreement that we had set up maybe a month or two before that for Niloy & Rohan - I'm sorry, Nilhan, Inc., and Nilhan Financial were the joint borrowers, and they borrowed $65 million line of credit, 25 million, 24 or $25 million against that to pay off Georgian Bank.  Then Nilhan Financial took the security interest.  We used the same documents that were assigned to Nilhan Financial.
> Q:      As of August 2008, did Nilhan Financial pay off the Georgian Bank loan balance?
> A:      That is correct.
> Q:      How much was that?
> A:      Close to 23, 24 million.
> Q:      Who owns Nilhan Financial? …

A:      … the intent was to have Niloy & Rohan own 50 percent each.  That's what I was mentioning earlier.  My goal was to have, from an estate-planning standpoint, the assets transferred over to the children and within our family. We consider all as, quote/unquote, Thakkar assets. And both my wife and I feel that transfer the assets while we alive versus later on.

Id. at 86:4 - 87:8.

Q:      … August 2008, did - we mentioned - we addressed Nilhan Financial payoff of Georgian Bank.  Did Niloy & Rohan pay anything to purchase the Hendon entities percentage in Orlando Gateway Partners?
A:      Absolutely not. The best of my knowledge, I think Niloy & Rohan paid about 3 million and 3.2 million.
Q:      Who did that go to?
A:      That went to Hendon.
Q:      Was there -
A:      No, actually, I don't know who, I don't remember.  But some of it went to Hendon and some of it stayed as capital.
Q:      You think it was roughly three million?
A:      That's correct.
Q:      And -
A:      Additional cash.
Q:      Right.  When you say "additional cash" what do you mean by that, in addition to what?
A:      No, the loan that we took over, this was, lack of better word, real equity that was put in by Niloy & Rohan, LLC, as capital.

Id. at 87:23 - 88:20 (emphasis added).

I [Thakkar] was just writing the checks.

Id. at 101:15.

Q:      What were the terms of the loan between Nilhan Financial and OGP, in terms of repayment?
A:      Once is it just was to be paid monthly and, two, is, best of my knowledge, was mature in three years or three-and-a-half years, something like that, but the interest was to be paid monthly.
Q:      Did Orlando Gateway Partners, LLC meet its obligations?
A:      No.

Id. at 105:20 - 106:3.

Q:     Was the Nilhan Financial to OGP loan being paid on a monthly basis by OGP?

A:     No.

<u>Id. at 112:14-16.</u>

51.     In his sworn Personal Financial Statement (the "PFS"), Thakkar stated that there was $22 million dollars in equity, no lender, and no debt to Nilhan Financial.  A copy of the PFS is attached hereto as **Exhibit S** and is incorporated herein by referenced.  Thakkar stated this again in his December 31, 2013 Schedule to his PFS.   Thakkar's PFS's submitted to the banks made not one mention of the Security Instruments or the Nilhan Financial Loan Agreement or obligation - no note, no mortgage - no debt of any kind referenced to Nilhan Financial.

52.     On February 25, 2015, Nilhan Financial instituted a foreclosure and breach of promissory note proceeding styled <u>Nilhan Financial, LLC v. Orlando Gateway Partners, LLC, et al.</u>, Case No. 2015-CA-001815-O (Division 32) (the "Foreclosure Litigation"), in the Florida State Court.  In the Foreclosure Litigation, Nilhan Financial filed a complaint for foreclosure of mortgage and action on note against OGP (the "Foreclosure Complaint").  In the Foreclosure Complaint, the only default  under the Security Instruments cited by Nilhan Financial are the recording and failing to satisfy or discharge the judgment liens created by the filing of the Florida Judgments by Good Gateway and SEG.

53.     In the Foreclosure Complaint, there is no mention of any other breaches under the Security Instruments, including the failure to make payments due under the Note, even though OGP had not made any payments in at least five years.  Nilhan Financial did not seek to sequester the rents or appoint a receiver over OGP.

\

54.    On April 16, 2015, Good Gateway and SEG filed an Answer, Affirmative Defenses & Counterclaim against the Debtors and Nilhan Financial. OGP, still managed by Thakkar, never filed an answer in the Foreclosure Litigation, and Nilhan Financial did not move for default.

55.    When Thakkar was questioned at the § 341 Meeting regarding the Foreclosure Litigation, he was incapable of explaining how he could objectively both represent Nilhan Financial's and OGP's interest in the litigation.

Mr. Shuker:    Okay, and recently, Nilhan Financial filed a foreclosure case against OGP, correct?

Mr. Thakkar:    That is correct.

Mr. Shuker:    Who made the decision to file the foreclosure case on behalf of Nilhan Financial? You, right?

Mr. Thakkar:    I did.

Mr. Shuker:    Who is going to make the decision on how to defend that? You?

Mr. Thakkar:    No.

Mr. Shuker:    Who — the Defendant – the Debtor is not going to defend to defend it?

Mr. Thakkar:    We've not made a decision on that.

Mr. Shuker:    Who would make that decision?

Mr. Thakkar:    Sorry?

Mr. Shuker:    Who would make that decision?

Mr. Thakkar:    I am not sure.

Mr. Shuker:    Who's the manager of OGP?

Mr. Thakkar:    I am.

\

Mr. Shuker:    So, you'll decide whether to answer the lawsuit that you filed?

Mr. Thakkar:   No. I need to get legal advice. It has to be whatever the right process is. I have not made the decision on who will … it has to be done the right way.

Mr. Shuker:    I notice here that the category for Nilhan Financial, it shows it's not disputed, correct? You didn't dispute the … OGP did not dispute this loan?

Mr. Thakkar: That's correct.
               See May 18, 2015, 11 U.S.C. §341 Meeting Transcript, pp. 133-134.

56.    Neither OGP, Thakkar, nor the Thakkar Non-Debtor Entities observed the necessary corporate formalities or exercised objectively independent business judgment:

(a)    The corporate offices of OGP are located at the corporate office of Nilhan Financial, and the employees of Nilhan Financial perform all administrative and accounting work for OGP; See id. at p. 27

(b)    For the past two years the accounting records for OGP have not been accurate and the journal entries have not been made because the responsible employee is not competent. As stated by Thakkar at the §341 Meeting,

Right now, journal entries are not [being made]   that's the reason why we have this issue … The transactions are entered by Rashid Mahmoud, okay? So, if you get an invoice and so on. But on the other hand, all of the inter-company transactions and journal entries will have to be done after a C.P.A. goes back to January 1 of 2014 and accurately reflects all the journal entries that need to be made; and they have not been made … We've just not had the infrastructure to do it, Id. At 115-116;

(c)    Historically, the tenants of OGP pay OGP, but the money is deposited in Nilhan Financial's bank account.  Nilhan Financial then transfers money to BB&T for the payment of monthly mortgage payments.  If OGP did not have sufficient funds to cover the monthly mortgage payment, then Nilhan Financial would cover the difference, or "lend the money short-term."  See id. at 55-58,65, 77-78, 154-156; and

\

(d)     OGP does not know what amounts have been transferred amongst OGP and Thakkar Non-Debtor Entities. Money has been lent and transferred, but there is no accurate recording or accounting of the financial transaction between the related parties.  See id. at 82, 97, 111, 129, 138, 151.

57.     Nilhan Financial has been in control of OGP since at least 2008. Nilhan Financial has and continues to exert so much control over the decision-making processes of OGP, such that Nilhan Financial has dominated the free will of OGP and should be held accountable as a fiduciary.

**COUNT I.
SUBORDINATION OF NILHAN FINANCIAL'S
CLAIM PURSUANT TO 11 U.S.C. §510(b)**

58.     Good Gateway and SEG re-assert and re-allege paragraphs 1 through 57 above, as if fully set forth herein.

59.     This is an action to pursuant to 11 U.S.C. §510(b) to subordinate the debt represented by the Security Instruments and the Claim to below the status of general unsecured creditors.

60.     Nilhan Financial is an insider and in *de facto* control of OGP.  Nilhan Financial has exerted so much control over the decision-making processes of OGP such that Nilhan Financial has dominated the free will of OGP and should be held accountable as a fiduciary.

61.     Nilhan Financial has engaged in at least the following inequitable conduct with respect to OGP: (i) caused OGP to breach its fiduciary duties to Good Gateway and SEG; (ii) released its mortgage rights regarding the Frontage Property without reducing the amount of the Mortgage remaining on the rest of the Original Property; (iii) failed to honor the construction loan commitment contained within the General Assignment; and (iv) used OGP as a mere instrumentality or alter ego.

62.    Nilhan Financial's conduct has injured Good Gateway and SEG, as evidenced by the Florida Judgments, and/or Nilhan Financial has received an unfair advantage by its inequitable conduct.

63.    The subordination of the Claim is not otherwise inconsistent with the Bankruptcy Code.

**WHEREFORE,** Good Gateway, LLC, and SEG Gateway, LLC respectfully request that this Court enter an order against Nilhan Financial, LLC: (i) subordinating the Claim pursuant to 11 U.S.C. §510(b) to below that status of general unsecured creditors; and (ii) for such other and further relief as the Court deems just and proper**.**

## COUNT II.
## RECHARACTERIZATION OF CLAIM AS EQUITY

64.     Good Gateway and SEG re-assert and re-allege paragraphs 1 through 57 above, as if fully set forth herein.

65.    This is an action pursuant to 11 U.S.C. §105(a) to recharacterize the Claim as an equity contribution to OGP.

66.    Upon information and belief, the funds acquired in the name of OGP through the Note and Mortgage were not all utilized for the benefit of OGP, but rather were also used for the benefit of Thakkar and the Thakkar Non-Debtor Entities.

67.    When Nilhan Financial acquired the Note and Mortgage, as well as the other loan documents, OGP was undercapitalized and had no means to further develop the Original Property.

68.    The loan documents prepared by Nilhan Financial and/or Thakkar do not have easily discernable maturity date.

69. The sole source of repayment on the Security Instruments was from the rental income, which was not even enough to pay the monthly debt service owed to the first lien holder, Branch Banking and Trust Company ("BB&T").

70. Upon information and belief, Nilhan Financial never attempted to enforce its right to monthly payments due under the Security Instruments and never pursued any default until the Foreclosure Litigation in 2015.

71. Nilhan Financial controlled OGP as a result of its acquisition of the Note and Mortgage.

72. Upon information and belief, OGP could not have obtained credit from any other outside source to either refinance or pay-off the Claim.

73. Upon information and belief, OGP has failed to make any payments due under the Security Interests.

74. No formal accounting method was followed with respect to the "short-term loans" made by Nilhan Financial to OGP to cover OGP's monthly mortgage payment due to BB&T.

75. Nilhan Financial's expectation of repayment on the Security Instruments, to the extent it had an expectation of repayment, was based solely on the success of OGP's business. OGP had no other source of repayment other than OGP's rental income.

76. The Claim should be recharacterized as equity based on the parties intent and the economic reality of the transaction.

**WHEREFORE,** Good Gateway, LLC, and SEG Gateway, LLC respectfully request that this Court enter an order against Nilhan Financial, LLC: (i) recharacterizing the Claim as equity in OGP; and (ii) for such other and further relief as the Court deems just and proper.

## COUNT III.
## DECLARATORY JUDGMENT

77.    Good Gateway and SEG re-assert and re-allege paragraphs 1 through 57 above, as if fully set forth herein.

78.    This is an action to pursuant to Federal Rule of Bankruptcy Procedure 7001(2) and (9) to obtain a declaratory judgment relating to the validity, priority, or extent of Nilhan Financial's lien on the OGP Property.

79.    A controversy within the jurisdiction of this Court has arisen between Plaintiffs and the Defendant, as a result of which the Plaintiffs are in doubt as to their rights.

80.    The maturity date for the Note and Mortgage was November 14, 2008.

81.    The Mortgage Modification did not expressly change the November 14, 2008 maturity date. The Amended Note could be read to condition the extension of the November 14, 2008 maturity date to July 15, 2011, based upon the advance of $1,247,948.00 by Nilhan Financial to OGP. Upon information and belief, NIlhan Financial did not advance $1,247,948.00 to OGP.

82.    Nilhan Financial did not bring an action to foreclose its mortgage lien on the OGP Property by November 14, 2013. Accordingly, pursuant to Florida Statute §95.281(1)(a), the mortgage lien is terminated.

83.    As such, there is uncertainty and confusion with respect to Nilhan Financial's mortgage lien and the judgment liens of Good Gateway and SEG.

**WHEREFORE,** Good Gateway, LLC, and SEG Gateway, LLC respectfully request that this Court enter a declaratory judgment: (i) declaring the rights of Good Gateway, LLC in the OGP Property; (ii) declaring the rights of SEG Gateway, LLC in the OGP Property; (iii) declaring the rights of Nilhan Financial, if any, in the OGP Property; and (iv) for such other and further relief as the Court deems just and proper. **COUNT IV.**

## OBJECTION TO CLAIM NO. 10

84.     Good Gateway and SEG re-incorporate and re-allege paragraphs 1 through 83 as set forth above.

85.     Good Gateway and SEG object to the Claim on the following grounds: (i) pursuant to 11 U.S.C. §502(b) based upon the aforementioned grounds to subordinate the Claim pursuant to 11 U.S.C. §510(b) or recharacterize the Claim as equity; and (ii) pursuant to Florida Statute §95.11(2)(b), which requires a legal or equitable action based on a contract, obligation, or liability founded on a written instrument to be brought within five years, and the Foreclosure Litigation was not commenced until at least six years and three months after the Note was due.

86.     Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the Bankruptcy Rules "shall constitute prima facie evidence of the validity and amount of the claim." The burden of proof is on the objecting party to produce evidence equivalent in probative value to that of the creditor to rebut the prime facie effect of the proof of claim. However, "the ultimate burden of persuasion is always on the claimant." In re Holm, 931 F.2d 620, 623 (9th Cir. 1991) (citing 3 L. King, Collier on Bankruptcy § 502.02, at 502-22 (15th ed. 1991) (footnotes omitted)); see also In re Leatherland Corp. 302 B.R. 250, 259 (Bankr. N.D. Ohio 2003).

\

A properly supported objection to a claim initiates a contested matter under the Bankruptcy Rules. See Fed. R. Bankr. P. 3007 (adv. comm. note).

      **WHEREFORE,** Good Gateway, LLC, and SEG Gateway, LLC respectfully request that this Court enter an order against Nilhan Financial, LLC:  (i) disallowing any and all claims by Nilhan Financial, LLC; or any amount owed to Nilhan Financial, LLC according to the Debtor's schedules under 11 U.S.C. §502(b); and (ii) for such other and further relief as the Court deems just and proper.

      **RESPECTFULLY SUBMITTED** this 21st day of August 2015.

    /s/ Mariane L. Dorris
    R. Scott Shuker, Esquire
    Florida Bar No.: 984469
    Mariane L. Dorris
    Florida Bar No. 0173665
    **LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
    111 N. Magnolia Avenue, Suite 1400
    Orlando, Florida  32801
    Telephone: (407) 481-5800
    Facsimile: (407) 481-5801
    Attorneys for Good Gateway, LLC and
    SEG Gateway, LLC

\